STUART G. GROSS (#251019)
sgross@grosskleinlaw.com
TIMOTHY S. KLINE (#319227)
tk@grosskleinlaw.com
**GROSS & KLEIN LLP**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FRIENDS OF GUALALA RIVER;** and **CENTER FOR BIOLOGICAL DIVERSITY,**<br><br>        Plaintiffs,<br>    v.<br><br>**GUALALA REDWOOD TIMBER, LLC,**<br><br>        Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 1

PARTIES ...................................................................................................................................... 3

   I.    Plaintiffs ............................................................................................................................ 3

   II.   Defendant ........................................................................................................................... 5

JURISDICTION ........................................................................................................................... 6

VENUE ......................................................................................................................................... 6

INTRADISTRICT ASSIGNMENT .............................................................................................. 6

LEGAL BACKGROUND ............................................................................................................ 6

FACTUAL BACKGROUND ........................................................................................................ 8

   I.    The Gualala River and Its Floodplain ............................................................................. 8

   II.   The Proposed Logging Project ......................................................................................... 9

   III.   The Gualala Listed Animals Endangered by the Proposed Logging ........................... 12

      A.   The California Red-Legged Frog ................................................................................. 12

      B.   The Northern Spotted Owl ........................................................................................... 15

      C.   Northern California Steelhead ...................................................................................... 16

      D.   The Central California Coast Coho Salmon ................................................................ 19

CLAIMS FOR RELIEF .............................................................................................................. 20

   FIRST CLAIM FOR RELIEF.................................................................................................. 20

   SECOND CLAIM FOR RELIEF ............................................................................................ 23

   THIRD CLAIM FOR RELIEF ................................................................................................ 26

   FOURTH CLAIM FOR RELIEF ............................................................................................ 31

PRAYER FOR RELIEF.............................................................................................................. 35

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    Plaintiffs Center for Biological Diversity and Friends of Gualala River (collectively,

2    "Plaintiffs"), hereby bring this action pursuant to § 9 of the Endangered Species Act ("ESA" or

3    "Act"), and 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) & (G) against Defendant Gualala Redwood

4    Timber, LLC ("GRT"), and allege on information and belief, except as indicated, as follows:

5    **INTRODUCTION**

6    1.    This action seeks to protect members of four endangered or threatened species

7    who call the Gualala River floodplain and its environs home: California red-legged frogs

8    (occasionally, "CRLF"); northern spotted owls (occasionally, "NSO"); Central California Coast

9    coho salmon (occasionally, "CCC Coho" or "coho"); Northern California steelhead (occasionally,

10   "NC Steelhead" or "steelhead") (collectively, the "Gualala Listed Animals").

11   2.    These animals all depend for their survival on the over three hundred acres of

12   floodplain in the Gualala River, where GRT plans to undertake major logging operations. As

13   shown below, the location planned for logging—known as the Dogwood THP—consists of

14



15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

almost the entirety of the lower Gualala River's floodplain, as well as floodplains of certain tributaries.

3.      Located within the County of Sonoma, just hours from the Greater Bay Area, the lower Gualala River floodplain represents an oasis for the Gualala Listed Animals and numerous other animals, insects, and plants.

4.      Last logged approximately 100 years ago, the lower Gualala River floodplain is carpeted by a lush mature riparian redwood forest of the kind that no longer exists elsewhere in the area and is exceedingly rare anywhere. It thus represents essential habitat for the Gualala Listed Animals.



5.      Not surprisingly, the logging that GRT proposes to conduct in this ecologically important area is reasonably certain to kill, harm, and/or harass the Gualala Listed Animals that inhabit the area.

COMPLAINT

6. In ESA §9 parlance, GRT's planned logging is reasonably certain to result in the "take" of these animals. This is reasonably certain to occur both directly—through such means as the crushing of California red-legged frogs that inhabit the forest floor over which GRT's heavy equipment will operate and harassment of Northern spotted owls nesting nearby in giant trees that will be felled—as well as through habit modification that significantly impairs essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering—through means such as the increased sedimentation in spawning and incubation gravels that steelhead and coho need for their survival.

7. GRT is aware of these facts; they have been brought to its attention numerous times. However, GRT has never sought an incidental take permit from National Marine Fisheries Service ("NMFS")—which has jurisdiction over the steelhead and coho—or from the United States Fish & Wildlife Service ("USFWS")—which has jurisdiction over the California red-legged frogs, and northern spotted owls.

8. Any such incidental take permit would have required that GRT adopt measures for minimizing the take of these animals to the greatest extent practicable, as well as develop a plan that would help facilitate their recovery.

9. Unless and until GRT applies for and receives an incidental take permit for each of the Gualala Listed Animals, its planned logging of the lower Gualala River floodplain is illegal and must be enjoined before these threatened and endangered animals are killed, harmed, harassed, and otherwise "taken" in violation of the ESA.

10. Plaintiffs respectfully request that the Court issue that injunction and thereby protect these imperiled animals in the manner that the ESA mandates.

**PARTIES**

I. **Plaintiffs**

11. Plaintiff **FRIENDS OF GUALALA RIVER** ("FoGR") is a non-profit, public interest corporation formed to protect the Gualala River Watershed and the species that rely on it. FoGR was formed in 1992 by a group of local residents in response to timber harvesting near a popular, heavily wooded campground on the north bank of the river. Since then, the organization

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

has provided concerned citizens a forum to share common concerns and research regarding the

welfare of the Gualala River, its estuary, its watershed, and habitat. FoGR's members and staff

include individuals with educational, scientific, spiritual, recreational, and other interests in the

protection of natural resources and species that inhabit the Gualala River and its environs,

including the California red-legged frog, the northern spotted owl, Northern California steelhead,

and Central California coho salmon. FoGR's members and staff visit the Gualala River and its

environs and enjoy the biological, recreational, and aesthetic values of the area—where the

California red-legged frog, northern spotted owl, Northern California steelhead, and Central

California coho salmon live—and FoGR's members and staff plan to visit and enjoy the Gualala

River and its environs in future. A critical component of the aesthetic, recreational, and spiritual

enjoyment that FoGR's members and staff gain from visiting the Gualala River and its environs is

viewing, listening, searching for, and communing with the threatened and endangered animals

that make the area home, including the Gualala Listed Animals. That aesthetic, recreational, and

spiritual enjoyment would be substantially diminished if those same animals were harmed, killed,

harassed, or their habitat modified in a way that harmed their essential behaviors. FoGR's

members and staff have participated for years in efforts to protect and preserve the habitat in the

lower Gualala River floodplain that is essential to the continued survival of these species. To

many, the area is affectionately known as the Magical Forest, and the Gualala Listed Animals

who inhabit the forest a large part of its magic. FoGR brings this action on its own behalf and on

behalf of its adversely affected members and staff.

12.     Plaintiff **CENTER FOR BIOLOGICAL DIVERSITY** ("CBD") is a non-profit,

public interest corporation with over 81,000 members. CBD has offices in Joshua Tree, Oakland,

and Los Angeles, California; as well as offices in Arizona, Colorado, Florida, New Mexico, North

Carolina, Oregon, Washington State, and Washington, D.C. CBD is actively involved in wildlife

and habitat protection issues throughout the United States and has members throughout our

country, thousands of whom reside in California. CBD's members and staff include individuals

with educational, scientific, spiritual, recreational, and other interests in the protection of natural

resources, including northern spotted owl, Northern California steelhead, and Central California

COMPLAINT

4

coho salmon. CBD's members and staff visit the Gualala River and its environs and enjoy the biological, recreational, and aesthetic values of the area—where the northern spotted owl, Northern California steelhead,  Central California coho salmon, and California red legged frog live—and CBD's members and staff plan to visit and enjoy the Gualala River and its environs in the future. A critical component of the aesthetic, recreational, and spiritual enjoyment that CBD's members and staff gain from visiting the Gualala River and its environs is viewing, listening, searching for, and communing with the threatened and endangered animals that make the area home, including the Gualala Listed Animals. That aesthetic, recreational, and spiritual enjoyment would be substantially diminished if those same animals were harmed, killed, harassed, or their habitat modified in a way that harmed their essential behaviors. CBD's members and staff have participated in efforts to protect and preserve the habitat essential to the continued survival of these species. CBD brings this action on its own behalf and on behalf of its adversely affected members and staff.

13.     Plaintiffs sue on behalf of themselves and their members who have concrete interests in the aesthetic, recreational, and spiritual enjoyment and protection of California's wild areas, including the Gualala River and its environs, and fish and wildlife species at self-perpetuating population levels, in the protection of our environment, and in the protection of water and air quality.

14.     Plaintiffs have complied with all procedural requirements, including the sending of a Notice of Intent to Sue, on July 7, 2008, to GRT, NMFS, USFWS, the U.S. Secretary of the Interior, the U.S. Secretary of Commerce, the California Department of Forestry and Fire Protection ("Calfire"), and the State of California. The Notice of Intent to Sue detailed the violations of the ESA detailed herein and invited GRT to confer with Plaintiffs regarding them. GRT did not take action on that invitation.

**II.     Defendant**

15.     Defendant **GUALALA REDWOOD TIMBER, LLC** ("GRT") is a California limited liability company with its principal place of business in Santa Clara County, California. GRT owns the timber and timberland at the location of the proposed logging, and filed a Timber

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Harvesting Plan ("Dogwood THP") for the proposed logging. The Dogwood THP was approved on March 30, 2018. GRT seeks to carry out the proposed logging. In the Dogwood THP, GRT states that the licensed timber operator ("LTO"), which will actually carry out the logging on behalf of GRT, is responsible for erosion control until the work completion report has been approved by the director. After that, the landowner, GRT, is responsible for erosion control.

## JURISDICTION

16.     This Court has jurisdiction over this action pursuant to the ESA citizen-suit provision, 16 U.S.C. § 1540(g), which also empowers the Court to enjoin Defendant from further violations of the ESA and its implementing regulations, id. § 1540(g)(1)(A).

17.     As required by 16 U.S.C. § 1540(g)(2)(A)(i), Plaintiffs provided Defendant with formal notice of the violations embodied in this complaint. CBD and FoGR submitted a notice of intent to sue by letter dated July 8, 2020 to GRT's owner, managing agents, registered agent, and the appropriate heads of agencies.

## VENUE

18.     Venue in this district is proper under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(b)(2).

## INTRADISTRICT ASSIGNMENT

19.     This action substantially arises out of actions planned to be taken in the county of Sonoma. Thus, under Civil L.R. 3-2(d) this action is to be assigned to the San Francisco Division or the Oakland Division.

## LEGAL BACKGROUND

20.     Section 9 of the ESA prohibits the "take" of endangered or threatened species. 16 U.S.C. § 1538(a)(1)(B). The term "take" is defined in the "broadest possible manner to include every conceivable way" in which a person could harm or kill fish or wildlife. S. Rep. No. 307, 93rd Cong., 1st Sess. 1, reprinted in 1973 U.S. Code Cong. & Admin. News 2989, 2995. Accordingly, the ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532 (19).

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

6

21.     NMFS has further defined the term "harm" to include "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102; *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 701 (1995) (upholding functionally indistinguishable USFWS regulatory definition).

22.     While NMFS has not promulgated a regulatory definition of "harass," USFWS regulations define "harass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3.

23.     ESA sections 9(a)(1)(B) and (G) prohibit any "take" of listed species that is not authorized by an incidental take permit (issued under section 10 of the Act) or an incidental take statement (issued under section 7 of the Act) issued by NMFS or USFWS. *See* 16 U.S.C. § 1539; 50 C.F.R. Parts 13, 17, & 222. Unauthorized activities that significantly degrade habitat in ways that impair the spawning, rearing, migrating, sheltering, feeding, or other essential behavioral patterns of the listed species are therefore illegal.

24.     To avoid liability under the ESA, one may obtain an incidental take permit under ESA section 10. 16 U.S.C. § 1539(a)(1)(B). To receive a permit to take any of the Listed Species pursuant to an ITP, one must, among other requirements, adopt measures for minimizing the take to the greatest extent practicable, as well as develop a plan that "conserv[es]" – i.e., helps facilitate the recovery of – the Listed Species. *Id.* §§ 1539(a)(1)(B), (a)(2)(A); *Sierra Club v. U.S. Fish and Wildlife Serv.*, 245 F.3d 434, 441-42 (5th Cir. 2001) ("'[c]onservation' is a much broader concept than mere survival" because the "ESA's definition of 'conservation' *speaks to the recovery of a threatened or endangered species*") (emphasis added). This plan, called a Habitat Conservation Plan must delineate "the impact which will likely result from such taking" and the "steps [you] will take to minimize and mitigate such impacts …." 16 U.S.C. § 1539(a)(2)(A).

1

## **FACTUAL BACKGROUND**

2

I.      **The Gualala River and Its Floodplain**

3       25.     The Gualala River enters the Pacific Ocean approximately 100 miles north of San

4   Francisco, marking the border of Mendocino and Sonoma Counties. The Gualala River watershed

5   encompasses a 740-mile stream network that flows through 191,000 acres of woodlands,

6   grasslands, and wetlands.

7       26.     The main stem of the Gualala River is designated as a Wild and Scenic River by

8   the State of California for its natural beauty and recreational value. The Gualala River is

9   characterized by its vigorous anadromous fishery and its extensive freshwater habitat. The

10  Gualala River has been designated as "Critical Habitat" under the ESA for the threatened

11  Northern California steelhead, and is also home to the endangered Central California Coast coho

12  salmon.

13      27.     A substantial portion of the Gualala River, including that which GRT proposes to

14  log, occupies a rift zone created by the San Andreas fault. As a result, not only does this portion

15  flow south to north, but it also has a broad and relatively flat floodplain. This broad floodplain is

16  home to a mature redwood ecosystem that includes ancient old-growth redwoods, as well as giant

17  100-year-old redwoods that tower over the river. It is the latter trees that GRT proposes to cut.

18

19

20

21

22

23

24

25

26

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111



## II.    The Proposed Logging Project

28.    The proposed logging would take place in the lower floodplain of the Gualala River and certain tributaries that GRT owns located in northwestern Sonoma County, California near the town of Gualala.

29.    Specifically, the location of the proposed logging consists of 342 acres on alluvial flats primarily on the east side of the South Fork of the Gualala River, along the south side of the mainstem of the Gualala River, along the north side of the Wheatfield Fork and Buckeye Creek,

COMPLAINT

and along the Big and Little Pepperwood creeks. It is near latitude 38.766330°, longitude 123.481894°. A portion of this location is within the Gualala River Coastal Zone Special Treatment Area, Wild and Scenic River Designation for the Main Stem of the Gualala.

30.     The location of the proposed logging is identified further in the Dogwood Timber Harvesting Plan, THP No. 1-15-042 SON, approved by the California Department of Forestry and Fire Protection on March 30, 2018. Timber operations are planned in 16 Sections, located in Townships 10N and 11N, and Ranges R15W and R16W, all located within Sonoma County. THP § I, p. 2-3. The proposed logging is proposed to take place in four planning watersheds: Mouth of the Gualala, Big Pepperwood, Little Creek, and Annapolis. *Id.* at 3.

31.     The location of the proposed logging contains a mature redwood forest ecosystem along the lower stem of the Gualala River and tributaries of the Gualala River. The location of the proposed logging contains some of the last remaining mature floodplain redwood forest in the area.

32.     Elevations within the location of the proposed logging range from 30 feet to 200 feet, and most of the location of the proposed logging is considered a flood-prone area. Seasonal wetlands occur in poorly drained flats, swales, relict overflow channels, and in old skid road track depressions in the Gualala River floodplain where logging is planned.

33.     Due to its location in an alluvial floodplain along the Gualala River and its tributaries, the location of the proposed logging contains extensive riparian ecosystems. Most of the ground in this area is wet or moist during most or all of the year.

34.     The Gualala River ecosystem and the Gualala River Listed Animals that use the location of the proposed logging have suffered from over a century of extractive resource use. Extensive logging and road-building practices since the 1860s have produced significant erosion, producing a legacy of increased sediment loads severely impacting aquatic habitat in the Gualala River and its tributaries. The floodplain on the location of the proposed logging was clear cut at the turn of the 20th century, and the area has been selectively harvested regularly since then.

35.     The proposed logging is located close to the Sonoma County Gualala Point Regional Park Campground, extending upriver to Switchville, at the Green Bridge, and

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

continuing along the South Fork which flows parallel to The Sea Ranch and directly across from, and beyond, the "Hot Spot." Additional tracts of land containing large redwoods are included in the expansive THP including units beyond Twin Bridges and along creeks in the Gualala River Watershed.

36.     Most of the area that would be logged is within the riparian zone of the South Fork Gualala River, which has already been listed under §303(d) for high sediment and temperature.

37.     In 1993, the USEPA listed the Gualala River on the Clean Water Act §303(d) list of impaired water bodies due to declines in anadromous salmonids from excessive sedimentation. The §303(d) listing was updated in 2003, and water temperatures in the basin are now impaired as well. Cold freshwater habitat is essential for fish migration and spawning. Logging operations have removed large streamside trees that previously provided shade, and reduced the amount of large woody debris that previously created deep pools of colder water.

38.     Past timber operations by GRT in the floodplain of the lower Gualala River have caused substantial, long-term, persistent, and effectively irreversible direct and indirect impacts to the ecosystem, including to the sensitive riparian redwood understory vegetation present at the location of the proposed logging. The recovery time required by shade-adapted understory vegetation following logging disturbances is reasonably certain to take many decades and lag behind the regeneration of mature redwood forest overstory structure.

39.     The proposed logging would remove primarily mature redwoods ranging from 90 to 100 years old from alluvial floodplains in the lower Gualala River watershed. The proposed logging would involve, without limitation, tree felling, log-hauling, and road improvements. The Dogwood THP further states that low lying, poorly drained areas would be drained, which indicates adverse hydrological modification of wetlands.

40.     Despite GRT's characterization of the proposed logging as a "very light harvest" (THP § 4, p. 153), it will involve the use of heavy equipment in floodplain areas; water drafting; cutting and felling trees; skidding harvested trees; hauling harvested trees; slash removal and stockpiling; and road reconstruction and maintenance. These logging activities will cause

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  significant disturbances to the biotic and abiotic elements of the location of the proposed logging

2  and nearby areas.

3      41.     Disturbances would include the removal of mature 90 to 100-year-old redwood

4  trees, thereby altering forest structures; compaction and erosion of alluvial soils; damage to

5  sensitive understory vegetation; impairment of waterways in the Gualala River watershed,

6  including, without limitation, by increasing water temperature and sedimentation; and the short-

7  and long-term disruption of species migration and prey availability.

8      42.     This rare ecosystem provides essential habitat for the Gualala Listed Animals. The

9  proposed logging and its associated activities are reasonably certain to result in the unlawful take

10 of these animals.

11     43.     These impacts would both directly take these animals through logging activities

12 and indirectly take them through substantial modification of their habitat that would impair the

13 spawning, rearing, migrating, sheltering, feeding, and/or other essential behavioral patterns of the

14 Gualala Listed Animals.

15 **III.    The Gualala Listed Animals Endangered by the Proposed Logging**

16     44.     The Gualala River, itself, and the lower Gualala River floodplain provide

17 irreplaceable habitat numerous fishes, birds, amphibians, reptiles, invertebrates, and mammals,

18 including each of the Gualala Listed Animals.

19     45.     GRT has not applied for or received an incidental take permit with regards to any

20 of the Gualala Listed Animals.

21     46.     The proposed logging project, if allowed to proceed without an incidental take

22 permit, is reasonably certain to result in the direct and indirect take of each of the Gualala Listed

23 Animals.

24     **A.    The California Red-Legged Frog**

25     47.     USFWS listed the California red-legged frog ("CRLF") as a threatened species

26 under the ESA in 1996. 61 Fed. Reg. 25813 (May 23, 1996). A species qualifies as "threatened"

27 if it is "likely to become an endangered species within the foreseeable future through all or a

28 significant portion of its range." 16 U.S.C. § 1532 (20).

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111



48.     The range of the CRLF includes Mendocino and Sonoma Counties, and thus the lower Gualala River floodplain. *See* 75 Fed. Reg. 12815.

49.     According to the USFWS' 2002 Recovery Plan for the species, CRLF "requires a variety of habitat elements with aquatic breeding areas embedded within a matrix of riparian and upland dispersal habitats . . . [including] pools and backwaters within streams and creeks, ponds, marshes, springs, sag ponds, dune ponds and lagoons."

50.     CRLFs mate and lay eggs in waterways or nearby riparian areas, including ephemeral drainages or wetlands; and mature frogs forage and disperse in both riparian and upland habitats.

COMPLAINT

51.     Research indicates a variety of CRLF migration patterns. Some CRLFs move along well-established corridors that provide specific sensory cues to guide movement. Many other long-distance migrating CRLF travel to and from breeding sites during the rainy season and move overland in relatively straight lines toward target sites.

52.     CRLF leave breeding habitat at various times throughout the rainy season. In one radio-telemetry study in Marin County, 66 percent of female frogs and 25 percent of male frogs moved to non-breeding areas even when the breeding site retained water.

53.     CRLF also leave breeding sites in the dry season to aestivate in upland refugia. For example, in Alameda Creek in September a radio-tagged male frog spent three weeks in a burrow 433 feet away from the water before returning to the stream channel. CRLFs are known to live in the floodplain and upland habitat near the location of the proposed logging.

54.     CRLF terrestrial habitats include mammal burrows, leaf litter, and under shrubs. CRLFs are, thus, susceptible to the harms of vegetation removal and physical disturbance to the landscape, compaction of soils, and loss of underground burrow networks.

55.     Diet analyses indicate the importance to CRLF of terrestrially derived prey. Stable carbon isotopes in frog tissue confirmed that dominant prey items include a mix of terrestrial carnivores (e.g., spiders, beetles, wasps) and detritivores (e.g., worms, ants). Small frogs are largely insectivorous, and although large adult frogs can consume aquatic vertebrates in the wet season, they consume terrestrial vertebrates in the dry season.

56.     There are four known records of CRLF occurring within 8 km (5 miles) of the Dogwood THP units. Three of these four records occur within one mile of proposed Unit 1, which is within the known dispersal distance (2 miles) for CRLF making movements through a combination of riparian and upland habitats. Two of these records are within 0.5 mile from proposed harvest units, including CRLF that were observed in the mainstem Gualala River at the Highway 1 bridge on July 30, 2014. The Gualala River is located approximately 38 miles south of the contact zone between CRLF and Northern red-legged frogs; and, thus, is understood to be inhabited by CRLF, rather than Northern red-legged frogs.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**B.** **The Northern Spotted Owl**

57.     USFWS listed the northern spotted owl as a threatened species throughout its

range under the ESA in 1990. 55 Fed. Reg. 26114. The northern spotted owl's range extends from

British Columbia to the San Francisco Bay, and includes the Gualala River watershed and

floodplain. *See id*. Dark brown with white spots, dark brown eyes, and a barred tail, northern

spotted owls are territorial, and usually monogamous. 77 Fed. Reg. at 71883.



58.     The northern spotted owl inhabits structurally complex forests from southwestern

British Columbia through Washington and Oregon to northern California. 77 Fed. Reg. 71876,

71877–78 (Dec. 4, 2012). They rely on older forested habitats that contain the structures and

characteristics required for nesting, roosting, foraging, and dispersal. 77 Fed. Reg. at 71884.

59.     USFWS listed the northern spotted owl as a threatened species primarily due to the

"loss and adverse modification of suitable habitat as the result of timber harvesting." *Id.* Since the

ESA listing, population analyses have documented the continued range-wide declines that are

attributed to the continued loss of habitat from logging and from the invasion of a non-native

competitor, the barred owl.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

1      60.    Barred owls apparently compete with spotted owls through a variety of

mechanisms: prey overlap; habitat overlap; and agonistic encounters. Maintaining forest

continuity and northern spotted owl nesting and roosting quality tends to reduce territorial

displacement by invasive barred owls, a significant contributing factor of northern spotted owl

decline in northwestern California in the last three decades.

      61.    The northern spotted owl similarly relies on older forest habitats containing mature

trees for nesting and roosting. Mature trees have the arboreal structures and characteristics

necessary for the owls' nesting and roosting. USFWS Northern Spotted Owl Recovery Plan

(2011).

      62.    GRT did not complete protocol surveys for the northern spotted owl prior to

submitting the Dogwood THP. THP § 2, p. 40.

      63.    However, northern spotted owls have been observed nesting in the Gualala River

watershed, particularly in the lower Gualala River floodplain that would be logged by GRT.

Previous surveys and landowner information show that the northern spotted owl has been

detected within 0.7 miles of the proposed timber operations (specifically within SON0012,

SON0017 (two ACs), SON0082, SON0085, SON0094, and an AC the landowner calls

SONVC—all within 0.7 miles). TPH § II, p. 39. Moreover, all harvest units have suitable habitat

for the northern spotted owl. *Id.*

## C.    <u>Northern California Steelhead</u>

      64.    The evolutionarily significant unit ("ESU") of steelhead, a type of salmonid,

known as the Northern California steelhead have been listed as a threatened species under the

ESA since 2006. 50 C.F.R. § 223.102(e); 71 Fed. Reg. 834 (Jan. 5, 2006) (designating as

"threatened" all naturally spawned populations of steelhead in California coastal river basins from

Redwood Creek southward to the Russian River, which includes the Gualala River watershed).

Thus, naturally spawned NC steelhead within the Gualala River watershed, including the location

of the proposed logging, are protected under the ESA.



65.     The Gualala River, including the location of the proposed logging, is also designated as Critical Habitat for NC steelhead. 50 C.F.R. § 226.211. ESA § 3(5)(A), 16 U.S.C. § 1532(5)(A), in its relevant section defines "critical habitat" of a threatened or endangered species as "(i) the specific areas within the geographical area occupied by the species . . . on which are found those *__physical or biological features (I) essential to the conservation of the species__* and (II) which may require special management considerations or protection . . . " (emphasis added). "Conservation" in this context means both survival of the threatened or endangered species as well as its recovery. Thus, The Gualala River is designated as "essential" for the NC steelhead's recovery. *Id*.

66.     Features of NC Steelhead habitat include floodplain connectivity, natural cover, cool clean water, in-stream large woody debris, and high dissolved oxygen concentration.

67.     NOAA Fisheries has found that "habitat degradation associated with forest practices was a significant contributor to the reduction in abundance and distribution of Northern California steelhead."  NOAA Fisheries, Coastal Multispecies Recovery Plan (2016).

68.     NC steelhead are anadromous fish, meaning they spawn and incubate in freshwater but spend some of their lives rearing in the marine environment. In general, steelhead return "home" to their natal environment to spawn and lay eggs within meters to kilometers from where they were spawned and hatched. After spawning, eggs typically incubate over winter. Steelhead

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

17

1  rely on species-specific availability of appropriately sized streambed substrate for spawning and

2  rearing conditions. This often occurs near groundwater exchange with surface water due to lower

3  temperatures and increased oxygen.

4          69.     In the spring, fry hatch from eggs at which point steelhead may migrate within the

5  watershed. Fry mature into parr, which rely heavily on freshwater and riparian terrestrial insects

6  for food. In California, parr typically remain in freshwater for less than one to up to three years.

7  The timing of steelhead downstream migration to the marine environment depends on

8  environmental conditions. After maturing at sea, steelhead return upriver to reproduce, usually

9  within close proximity to their natal stream reach.

10         70.     NC steelhead are documented as rearing extensively in lagoonal estuaries in

11  California—such as the downriver portions of the location of the proposed logging along the

12  Gualala River—where they may benefit from higher growth rates and ultimately increased

13  survival compared to individuals rearing in upstream habitats. Rearing juvenile NC steelhead are

14  commonly found in the Gualala River estuary.

15         71.     The dominant land use in the Gualala watershed is logging and road building

16  associated with logging, which are central drivers of salmon population declines. (CEPA

17  2010). Due to these and other contributing factors, the Gualala River is currently in violation of

18  federal and California water quality standards for sediment and temperature. (CEPA

19  2010).NOAA Fisheries has specifically identified future logging as a threat to NC steelhead

20  recovery on the Gualala River due to "reduced canopy cover resulting in increased stream water

21  temperatures, increased sediment load into adjacent waterways impairing gravel quality in

22  downstream reaches, and significant loss of [large woody debris] recruitment, which is an

23  essential component of habitat complexity, form and function." NOAA Fisheries, Coastal

24  Multispecies Recovery Plan (2016). The Dogwood THP notes that "large woody debris function

25  in the channel is low throughout the watershed," and that there is already a "general watershed-

26  wide lack of instream habitat complexity." THP § IV, p. 154-55.

27

28

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

### D.     The Central California Coast Coho Salmon

72.     NMFS listed the Central California Coast Coho Evolutionary Significant Unit[1] as an endangered species under the ESA in 2005. 70 Fed. Reg. 37160 (June 28, 2005). CCC coho's range spans Punta Gorda to the San Lorenzo River, which includes the Gualala River and its watershed. 50 C.F.R. § 226.210.



73.     Freshwater habitat requirements for CCC coho include access to floodplains, such as the location of the proposed logging, side channels, and low-velocity habitat during high flow events; deep complex pools formed by large woody debris; adequate quantities of water; cool water temperatures, unimpeded passage to spawning grounds and back to the ocean; and adequate quantities of clean spawning gravel. NOAA Fisheries, Central California Coast Coho Salmon Recovery Plan (2012).

74.     Logging and road construction are major causes of CCC coho habitat degradation. *Id.*

---

[1] The abbreviation "ESU" stands for "evolutionarily significant units."  It is a term for a population of organisms that is considered distinct for purposes of conservation, including special status designations under the Federal and California Endangered Species Acts.

COMPLAINT

75.     Like steelhead, CCC coho are anadromous fish, meaning they spawn and incubate in freshwater but spend some of their lives rearing in the marine environment, laying eggs within meters to kilometers from where they were spawned and hatched. After spawning, eggs typically incubate over winter. CCC coho rely on species-specific availability of appropriately sized streambed substrate for spawning and rearing conditions. This often occurs near groundwater exchange with surface water due to lower temperatures and increased oxygen.

76.     In the spring, fry hatch from eggs at which point coho may migrate within the watershed. Fry mature into parr, which rely heavily on freshwater and riparian terrestrial insects for food. In California, parr typically remain in freshwater for less than one to up to three years. The timing of coho downstream migration to the marine environment depends on environmental conditions. After maturing at sea, adult coho return upriver to reproduce, usually within close proximity to their natal stream reach.

77.     CCC coho are documented as rearing extensively in lagoonal estuaries in California—such as the downriver portions of the location of the proposed logging along the Gualala River—where they may benefit from higher growth rates and ultimately increased survival compared to individuals rearing in upstream habitats. CCC coho have been documented in the Gualala watershed.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

(Violation of § 9 of the ESA – Unauthorized Take of California Red-Legged Frogs)

78.     Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

79.     The proposed logging is reasonably certain to significantly disrupt and impair essential CRLF behavioral patterns, including movement, migration, breeding, feeding, and sheltering. The forms of habitat modification that are reasonably certain to cause take to CRLF include, but are not limited to: vegetation removal, physical disturbance to the landscape, compaction of soils, and loss of underground burrow networks.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

80.     The proposed logging is also reasonably certain to cause direct take of CRLF. Tree falling, skidding, logging, trucking, water drafting, road building, and general heavy equipment use are reasonably certain to directly kill, harm, and harass CRLFs.

81.     The proposed logging, thus, is reasonably certain to interfere not only with the physical habitat integrity of CRLF and cause take directly, but also affect food resources for CRLF and indirectly cause take in that way.

82.     USFWS has delineated a maximum protective buffer limit of 1 mile, with variable minimum distances around aquatic habitats to be determined by locally known dispersal patterns which can be up to 2 miles. 75 Fed. Reg. 12816 (2010). Persistent occupancy of sites by CRLF is especially sensitive to fragmentation by roads. The scientific literature reflects a consensus that buffer zones to protect CRLF should provide connectivity among aquatic habitats (i.e., the margins of the river and the various off-channel water bodies and ponds encompassed within the location of the proposed logging).

83.     The Dogwood THP indicates that the proposed logging will variously implement 30-foot and 300-foot buffer areas to avoid causing take of the CRLF. THP § II, p. 44-45. These buffer lengths are extremely deficient and thus will not prevent take.

84.     Without a 1-mile buffer area, the construction of haul roads and skid trails within the location of the proposed logging is reasonably certain to disturb dispersal patterns and disrupt migration to and away from breeding sites, causing take of CRLF. The concomitant sedimentation of aquatic breeding habitats from road construction is also reasonably certain to disrupt migration to breeding sites, causing take of CRLF.

85.     In addition to the proposed logging's substantial modification of CRLF habitat, resulting in indirect take, timber harvesting activities are reasonably certain to result in direct take by killing or injuring individual CRLFs.

86.     CRLFs commonly reside in ground squirrel burrows and thus take may go undetected when the ground is disturbed.

87.     The proposed logging would utilize various forms of heavy equipment to remove trees and develop a network of haul roads and skid trails in the location of the proposed logging,

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

including the use of previously abandoned skid trails and haul roads, which now form depressions in which water seasonally collects forming wetland habitat and the construction of water crossings.

88.     Water drafting would also occur at multiple water holes and gravel holes within or near the location of the proposed logging.

89.     The Dogwood THP explicitly acknowledges the following biological impacts: "disturbance of animal species in the summertime through logging and trucking activity [and] . . . directly killing certain slow-moving or non-mobile plant and animal species through falling, skidding, logging, trucking and road-building activities." THP § 4, p. 146.

90.     These activities are reasonably certain to result in the direct take of CRLF, which are relatively slow-moving and, during certain times of the year, stationary. CRLF forage in both riparian areas and upland areas during the April to November period of active timber operations. CRLFs are particularly susceptible to direct physical harm in upland areas during the dry season—the primary period for timber harvesting operations—when CRLFs commonly reside in mammal burrows. CRLFs, in adult and egg form, are also reasonably certain to exist in water drafting locations and locations where water crossings are constructed. CRLFs, including both adult and animals and in the egg stage, at the location of the proposed logging are reasonably certain to go undetected under the Dogwood THP's lax survey requirements, and thus are reasonably certain to be crushed and otherwise harmed by heavy equipment use and other activities that are part of the proposed logging.

91.     Given the variety of CRLF movement behaviors, without a 1-mile buffer radius around all aquatic habitats encompassed within the boundaries of the Dogwood THP—which is not part of the proposed logging—CRLFs are reasonably certain to be taken, including through killing, harming, and harassing.

92.     GRT has not requested or received an incidental take permit for CRLFs from USFWS concerning the proposed logging.

93.     Unless enjoined, Defendant will carry out the proposed logging, including the logging of mature redwoods, log-hauling, and implementing road improvements along sensitive

Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

COMPLAINT

1  alluvial floodplain habitat. This is reasonably certain to result in the unlawful take of CRLFs in

2  violation of 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) & (G).

3       94.     Thus, the proposed logging violates 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) & (G).

4  WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

5                              **SECOND CLAIM FOR RELIEF**

6            (Violation of § 9 of the ESA – Unauthorized Take of Northern Spotted Owls)

7       95.     Plaintiffs incorporate by reference all the allegations contained in the previous

8  paragraphs as though fully set forth herein.

9       96.     The proposed logging is reasonably certain to cause significant habitat

10  modification or degradation that significantly impairs essential northern spotted owl behavioral

11  patterns, including breeding, feeding, and sheltering.

12       97.     The forms of habitat modification that are reasonably certain to cause take to the

13  northern spotted owl include but are not limited to: loss of nesting sites, reduction of stand

14  density, and logging activity disturbances.

15       98.     Additionally, the proposed logging is reasonably certain to cause direct take of

16  northern spotted owls. Felling trees that house fledgling birds not old enough to fly or live on

17  their own is reasonably certain to kill or harm individuals of these species.

18       99.     The proposed logging is reasonably certain to harass northern spotted owls via

19  significant noise and physical disturbances.

20       100.    The proposed logging would substantially modify the mature, late-seral redwood

21  forests inhabited by northern spotted owls by removing many of the century-old trees that

22  comprise that forest type.

23       101.    Disturbances to the location of the proposed logging from timber operations,

24  including tree felling and removal, slash piling and removal, and road construction and

25  maintenance, would result in further persistent impacts to northern spotted owl habitat. Northern

26  spotted owls rely on continuous, mature redwood stands for breeding, feeding, sheltering, and

27  other key behavioral patterns.

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

102. It is reasonably certain that the proposed logging would result in the take of northern spotted owls through the destruction and loss of nesting sites.

103. Maintaining northern spotted owl nesting and roosting quality also reduces territorial displacement by invasive barred owls. USFWS Northern Spotted Owl Recovery Plan (2011). The proposed logging is reasonably certain to interfere with northern spotted owl nesting and roosting quality, thus exacerbating displacement by invasive barred owls and constituting a take of these animals, including through harm and harassment.

104. Thus, the proposed logging is reasonably certain to remove northern spotted owl nesting and roosting sites, constituting a take of this species through harm and harassment.

105. The proposed logging would increase forest fragmentation and reduce stand density at the location of the proposed logging, and so is reasonably certain to result in increased predation, causing the take of this northern spotted owls through killing, harm, and harassment.

106. Continuous stands of mature forest also provide quality nesting, roosting, and foraging habitat for northern spotted owls. Northern spotted owls rely on foraging habitat created by dense stands of mature trees, which harbor the complex understory vegetation conducive to northern spotted owl prey species, including rodents.

107. GRT's plan to avoid take of the northern spotted owl by retaining some sections of habitat is inadequate. THP § 2, p. 41. The proposed logging would reduce the canopy density of the mature forest and result in the removal of understory vegetation. These effects are reasonably certain to reduce prey availability to northern spotted owls, causing indirect take, and cause direct take through harm and harassment.

108. Additionally, by providing healthy habitat for northern spotted owls, maintaining continuous stands of mature forest moderates their displacement by the invasive barred owl. Conversely, the fragmentation of older forests exacerbates the threat posed by barred owl invasion into forests once occupied by northern spotted owls. Researchers have found a direct correlation between the likelihood of barred owl invasion of spotted owl territories and the lack of older forest.

COMPLAINT

24

109.    The proposed logging, by increasing forest fragmentation, is reasonably certain to increase barred owl invasion and result in the take of northern spotted owls through killing, harm, and harassment.

110.    Northern spotted owl nesting coincides with planned active timber operations. Females typically lay eggs in late March or April, and juveniles leave the nest in late May or June, though juveniles are dependent on their parents until September when they are able to fly and hunt on their own. USFWS Northern Spotted Owl Recovery Plan (2011). Thus, it is reasonably certain that felling trees home to owl fledglings not yet old enough to fly will actually injure or kill them, resulting in direct take.

111.    The proposed logging is also reasonably certain to "harass" northern spotted owls. USFWS defines "harass" as an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3.

112.    The proposed logging will cause significant noise and physical disturbances, resulting in poorer nesting, roosting, and foraging habitat for the northern spotted owl, thereby constituting a take through harm and harassment.

113.    GRT submitted an attachment to the Dogwood THP authorized by USFWS in 2011. THP § II, p. 41. It states that "to avoid take of NSO [northern spotted owl] from noise disturbances, road use within ¼ mile of a NSO activity center during the breeding season is prohibited until July 10th." *Id.* However, GRT was granted to an exception to this requirement. *Id.* Thus, take of northern spotted owls is reasonably certain to occur through harassment if the proposed logging occurs.

114.    GRT has not requested or received an incidental take permit for northern spotted owls from USFWS concerning the proposed logging.

115.    Unless enjoined, Defendant will carry out the proposed logging, including the logging of mature redwoods, log-hauling, and implementing road improvements along sensitive

Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

COMPLAINT

alluvial floodplain habitat. This is reasonably certain to result in the unlawful take of northern spotted owls in violation of 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) & (G).

116.    Thus, the proposed logging violates 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) & (G).

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

### THIRD CLAIM FOR RELIEF
(Violation of § 9 of the ESA – Unauthorized Take of Northern California Steelhead)

117.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

118.    The proposed logging is reasonably certain to significantly disrupt and impair essential NC steelhead behavioral patterns, including spawning, rearing, feeding, and sheltering, through significant habitat modification.

119.    The forms of habitat modification that are reasonably certain to cause take to NC steelhead include, but are not limited to: increased sedimentation in spawning and incubation gravels; loss of floodplain characteristics essential to salmonid rearing; impairments of estuarine habitat, including increased sediment, chemical nutrients, temperatures, and decreased oxygen; and the removal of riparian vegetation. These forms of habitat modification are reasonably certain to cause take of NC steelhead by killing, injuring, harassing, or harming these species.

120.    The cumulative effects of the proposed logging are reasonably certain to cause take of NC steelhead by killing, injuring, harassing, or harming these species.

121.    The proposed logging's impacts on NC steelhead would include physical, chemical, and biological impairments to multiple stages of salmonid development. Increased sedimentation, loss of important floodplain characteristics, impairments to the Gualala estuary, and cumulative effects of the proposed logging are reasonably certain to cause take of NC steelhead by killing, harming, or harassing members of this species.

122.    The substrate of the South Fork Gualala River floodplain, in which most of the proposed logging would take place, is almost completely gravel. THP § 4, p. 153. The interstitial spaces between gravels provide critical housing for salmon eggs.

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

123.    Logging and its necessary road use increase land surface runoff and surface erosion processes, thereby increasing instream sediment inputs and stream channel entrenchment, and decreasing floodplain connectivity. Sediment deposition can impair instream spawning and incubation by filling interstitial spaces between gravels used for egg deposition and incubation, thus decreasing the availability of oxygen to incubating embryos and altering thermal regimes influenced by groundwater.

124.    Embryo survival decreases with increased sedimentation in spawning redds (gravel depressions where salmonids spawn). Suspended sediment generated from soil disturbance and erosion caused by logging on floodplains and other near-stream locations can increase turbidity and decrease the growth and survival of fishes.

125.    Mechanisms of impact caused by elevated suspended sediment include: alteration of behavior and reduced physiological health of juvenile steelhead; decreased productivity of stream and estuary food webs, which can deplete the aquatic food sources that support fish growth; and interference with foraging by salmonids, increasing feeding costs and reducing growth.

126.    The Dogwood THP makes clear that sedimentation is reasonably certain to occur. THP § IV, p. 146 (listing among "[t]he major biological impacts" of the proposed logging: "erosion of the soil with the resulting loss of forest productivity and the sedimentation of the watercourses affecting downstream fisheries and instream habitat for aquatic species.").

127.    The Dogwood THP also states that the proposed logging's erosion hazard will be variously low, medium, and high. THP § II, p. 14. And Unit #1 in the THP is moderately steep with "unstable areas," so is more likely to experience erosion. *See* THP § III, p. 97.

128.    Vegetation removal and soil disturbance from logging activities are reasonably certain to increase sedimentation within the floodplain and reduce the floodplain's capacity to trap and stabilize sediments during flood events, resulting in increased sedimentation of the Gualala River.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

129.    Given the direct causal connection between sedimentation and harm to salmonids, including, without limitation, as laid out above, such sedimentation is reasonably certain to cause take of NC steelhead, including by killing, harming, and harassing members of this species.

130.    Natural floodplain processes and floodplain complexity are essential to the maintenance of salmon habitat. The natural flood-pulse disturbance regime of floodplain habitats maintains complexes of backwater and spring channels that exhibit water velocities, temperatures, and prey sources better suited than mainstem habitats for the growth of rearing juvenile salmonids. Multiple studies describe increased growth and abundance of juvenile salmonids on off-channel floodplain habitat, due to thermal refugia and increased productivity and prey.

131.    Both aquatic and terrestrial inputs of prey are important aspects of salmon growth in floodplain habitats. Because excessive sedimentation ultimately decreases floodplain and riparian connectivity, as well as the quality and productivity of those floodplain habitats, juvenile salmon growth may decrease, ultimately leading to decreased salmon survival at sea.  Moreover, removal of riparian vegetation is reasonably certain to increase stream temperature and decrease fish cover in floodplain habitats.

132.    The Dogwood THP admits that these impacts are reasonably certain to occur. THP § IV, p. 146 (listing among "[t]he major biological impacts" of the proposed logging: "change of habitat for certain groups of species through the conversion of existing eighty to one-hundred-year-old timber stands to younger age classes.").

133.    Given that the Gualala River is already in violation of temperature standards, further increasing temperatures from logging are reasonably certain to decrease suitable rearing area and salmon growth, while the loss of cover is reasonably certain to increase predation on rearing salmonids. These impacts are reasonably certain to cause take to NC steelhead, including by killing, harming, and harassing members of these species.

134.    Increased sediment, chemical nutrients, temperatures, and decreased oxygen in the Gualala River estuary are reasonably certain outcomes of the proposed logging in the lower watershed. These effects are, furthermore, reasonably certain to be exacerbated by recent timber harvests in steep and highly erodible areas directly above the lower watershed areas to be logged

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

(including without limitation the Apple, Kestrel, and German South THPs), which already contribute to greater sediment yields to the Gualala River estuary.

135.    Estuaries are considered exceptionally valuable to salmon growth and smoltification, providing services including buffering of sediment transport, purifying water, storing carbon and other nutrients, and buffering against sea-level rise and storm surges. The Gualala River estuary is known steelhead rearing habitat.

136.    Consequently, changes in estuarine habitat have significant implications for NC steelhead viability. Increased sediment, nutrients, and temperatures resulting from logging in the Gualala River and its estuary are reasonably certain to impair NC Steelhead feeding and growth for reasons described above regarding floodplain characteristics, thus resulting in the take of NC Steelhead.

137.    Moreover, increasing nutrient loads, including nitrogen, phosphorus, and dissolved and particulate carbon mobilized by logging disturbance of floodplain vegetation and soils will further lead to increased microbial oxygen demand, especially at night. This will result in decreased dissolved oxygen levels in the estuary, which already approach hypoxic conditions at some times of the year. High temperatures and low dissolved oxygen are reasonably certain to become harmful or lethal to rearing and spawning NC Steelhead and their prey, resulting in the take of these animals.

138.     In a lagoonal northern California estuary, increasing water temperatures above bioenergetic optima is documented as causing decreased growth rates of juvenile steelhead, which can compromise ocean survival and successful reproduction.

139.    Thermal refugia within estuaries play an important role when temperatures increase, but estuarine complexity—including groundwater inputs that provide essential refugia—is reasonably certain to be reduced by increased sediment inputs.

140.    Additionally, sedimentation resulting from logging is reasonably certain to cause increased frequency of estuary closure by sand bar formation, resulting in bird predation on estuary rearing NC Steelhead and forced delay of seaward migration for prolonged periods is also

COMPLAINT

29

1    reasonably certain to increase, resulting in the take of these animals through their killing,

2    harming, and harassment.

3        141.    Excessive temperature increases additionally block migration and causes pre-

4    spawn mortality of adult NC Steelhead migrating upstream to spawn. These impacts on the

5    Gualala River estuary are reasonably certain to cause take to NC steelhead, including by killing,

6    harming, and harassing members of these species.

7        142.    Riparian vegetation removal called for as part of the proposed logging—resulting

8    in increased light and stream temperatures, and logging activities—resulting in increased

9    sediment and nutrient inputs, are reasonably certain to cause cascading effects through aquatic

10   food webs that will negatively impact NC steelhead growth, survival, and reproduction, resulting

11   in their take.

12       143.    Algal and aquatic plant productivity are reasonably certain to increase

13   substantially after logging, and homogenizing the macroinvertebrate communities upon which

14   freshwater rearing NC steelhead salmon depend. Thus, the combined impacts of the proposed

15   logging in the Gualala River watershed are reasonably certain to decrease the viability of

16   incubating eggs, decrease growth and survival of rearing salmonids, degrade spawning habitat,

17   and cause pre-spawning mortality, thereby resulting in the take of these animals.

18       144.    Particularly considering the present extremely precarious state of NC steelhead in

19   the riverine and estuarine habitat of the Gualala River ecosystem, the proposed logging's habitat

20   modifications are reasonably certain to cause take of animals of this species.

21       145.    GRT has not requested or received an incidental take permit for NC steelhead from

22   NMFS concerning the proposed logging.

23       146.    Unless enjoined, Defendant will carry out the proposed logging, including the

24   logging of mature redwoods, log-hauling, and implementing road improvements along sensitive

25   alluvial floodplain habitat. This is reasonably certain to result in the unlawful take of NC

26   steelhead in violation of 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) & (G).

27       147.    Thus, the proposed logging violates 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) & (G).

28          WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**FOURTH CLAIM FOR RELIEF**

(Violation of § 9 of the ESA – Unauthorized Take of Central California Coast Coho)

148.    Plaintiffs incorporate by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

149.    The proposed logging is reasonably certain to significantly disrupt and impair essential CCC coho salmon behavioral patterns, including spawning, rearing, feeding, and sheltering, through significant habitat modification.

150.    The forms of habitat modification that are reasonably certain to cause take of CCC coho salmon include, but are not limited to: increased sedimentation in spawning and incubation gravels; loss of floodplain characteristics essential to salmonid rearing; impairments of estuarine habitat, including increased sediment, chemical nutrients, temperatures, and decreased oxygen; and the removal of riparian vegetation. These forms of habitat modification are reasonably certain to cause take of CCC coho salmon by killing, injuring, harassing, or harming these species.

151.    The cumulative effects of the proposed logging are reasonably certain to cause take of CCC coho salmon by killing, injuring, harassing, or harming these species.

152.    The proposed logging's impacts on CCC coho habitat would include physical, chemical, and biological impairments to multiple stages of salmonid development. Increased sedimentation, loss of important floodplain characteristics, impairments to the Gualala estuary, and cumulative effects of the proposed logging are reasonably certain to cause take of CCC coho by killing, harming, or harassing members of this species.

153.    Logging and its necessary road use increase land surface runoff and surface erosion processes, thereby increasing instream sediment inputs and stream channel entrenchment, and decreasing floodplain connectivity. Sediment deposition can impair instream spawning and incubation by filling interstitial spaces between gravels used for egg deposition and incubation, thus decreasing the availability of oxygen to incubating embryos and altering thermal regimes influenced by groundwater.

154.    Embryo survival decreases with increased sedimentation in spawning redds (gravel depressions where salmonids spawn). Suspended sediment generated from soil disturbance and

COMPLAINT

erosion caused by logging on floodplains and other near-stream locations can increase turbidity and decrease the growth and survival of fishes.

155.    Mechanisms of impact caused by elevated suspended sediment include: alteration of behavior and reduced physiological health of juvenile steelhead and coho salmon; decreased productivity of stream and estuary food webs, which can deplete the aquatic food sources that support fish growth; and interference with foraging by salmonids, increasing feeding costs and reducing growth.

156.    The Dogwood THP makes clear that sedimentation is reasonably certain to occur. THP § IV, p. 146 (listing among "[t]he major biological impacts" of the proposed logging: "erosion of the soil with the resulting loss of forest productivity and the sedimentation of the watercourses affecting downstream fisheries and instream habitat for aquatic species.").

157.    The Dogwood THP also states that the proposed logging's erosion hazard will be variously low, medium, and high. THP § II, p. 14. And Unit #1 in the THP is moderately steep with "unstable areas," so is more likely to experience erosion. *See* THP § III, p. 97.

158.    Vegetation removal and soil disturbance from logging activities are reasonably certain to increase sedimentation within the floodplain and reduce the floodplain's capacity to trap and stabilize sediments during flood events, resulting in increased sedimentation of the Gualala River.

159.    Given the direct causal connection between sedimentation and harm to salmonids, such sedimentation is reasonably certain to cause take of CCC coho, including by killing, harming, and harassing members of these species.

160.    Natural floodplain processes and floodplain complexity are essential to the maintenance of salmon habitat. The natural flood-pulse disturbance regime of floodplain habitats maintains complexes of backwater and spring channels that exhibit water velocities, temperatures, and prey sources better suited than mainstem habitats for the growth of rearing juvenile salmonids. Multiple studies describe increased growth and abundance of juvenile salmonids on off-channel floodplain habitat, due to thermal refugia and increased productivity and prey.

161.    Both aquatic and terrestrial inputs of prey are important aspects of salmon growth in floodplain habitats. Because excessive sedimentation ultimately decreases floodplain and riparian connectivity, as well as the quality and productivity of those floodplain habitats, juvenile salmon growth may decrease, ultimately leading to decreased salmon survival at sea. Moreover, removal of riparian vegetation is reasonably certain to increase stream temperature and decrease fish cover in floodplain habitats.

162.    The Dogwood THP admits that these impacts are reasonably certain to occur. THP § IV, p. 146 (listing among "[t]he major biological impacts" of the proposed logging: "change of habitat for certain groups of species through the conversion of existing eighty to one-hundred-year-old timber stands to younger age classes.").

163.    Given that the Gualala River is already in violation of temperature standards, further increasing temperatures from logging is reasonably certain to decrease suitable rearing area and salmon growth, while loss of cover is reasonably certain to increase predation on rearing salmonids. These impacts are reasonably certain to cause take of CCC coho, including by killing, harming, and harassing members of these species.

164.    Increased sediment, chemical nutrients, temperatures, and decreased oxygen in the Gualala River estuary are reasonably certain outcomes of the proposed logging. These effects are, furthermore, reasonably certain to be exacerbated by recent timber harvests in steep and highly erodible areas directly above the lower watershed areas to be logged (including without limitation the Apple, Kestrel, and German South THPs), which contribute to greater sediment yields to the Gualala River estuary.

165.    Estuaries are considered exceptionally valuable to salmon growth and smoltification, providing services including buffering of sediment transport, purifying water, storing carbon and other nutrients, and buffering against sea-level rise and storm surges.  CCC coho smolts and spawners must traverse the estuary at least twice to complete their life cycles.

166.    Consequently, changes in estuarine habitat have significant implications for salmon viability.  Increased sediment, nutrients, and temperatures resulting from the proposed logging in the Gualala River and its estuary are reasonably certain to impair feeding and growth

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

33

1  for reasons described above regarding floodplain characteristics, thus causing the take of CCC

2  coho, including through the killing, harming, and harassment of members of this species.

3      167.    Moreover, increasing nutrient loads, including nitrogen, phosphorus, and dissolved

4  and particulate carbon mobilized by logging disturbance of floodplain vegetation and soils will

5  further lead to increased microbial oxygen demand, especially at night. This will result in

6  decreased dissolved oxygen levels in the estuary, which already approach hypoxic conditions at

7  some times of the year. High temperatures and low dissolved oxygen are reasonably certain to

8  become harmful or lethal to rearing and spawning CCC coho and their prey, resulting in the take

9  of these animals.

10     168.    Thermal refugia within estuaries play an important role when temperatures

11 increase, but estuarine complexity—including groundwater inputs that provide essential refugia—

12 is reasonably certain to be reduced by increased sediment inputs.

13     169.    Additionally, sedimentation resulting from logging causes increased frequency of

14 estuary closure by sand bar formation, resulting in bird predation on CCC coho and forced delay

15 of seaward migration for prolonged periods is also reasonably certain to increase, resulting in the

16 take of these animals through their killing, harming, and harassment.

17     170.    Excessive temperature increases additionally block migration and causes pre-

18 spawn mortality of adult CCC coho migrating upstream to spawn. These impacts on the Gualala

19 River estuary are reasonably certain to cause take to CCC coho, including by killing, harming,

20 and harassing members of these species.

21     171.    Riparian vegetation removal called for as part of the proposed logging—resulting

22 in increased light and stream temperatures, and logging activities—resulting in increased

23 sediment and nutrient inputs, are reasonably certain to cause cascading effects through aquatic

24 food webs that will negatively CCC coho growth, survival, and reproduction, resulting in their

25 take.

26     172.    Algal and aquatic plant productivity are reasonably certain to increase

27 substantially after logging, and homogenizing the macroinvertebrate communities upon which

28 freshwater rearing CCC coho salmon depend. Thus, the combined impacts of the proposed

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT

logging in the Gualala River watershed are reasonably certain to decrease the viability of incubating eggs, decrease growth and survival of rearing salmonids, degrade spawning habitat, and cause pre-spawning mortality, thereby resulting in the take of these animals.

173.    Particularly considering the present extremely precarious state of CCC coho in the riverine and estuarine habitat of the Gualala River ecosystem, the proposed logging's habitat modifications are reasonably certain to cause take of animals of this species.

174.    GRT has not requested or received an incidental take permit for CCC coho from NMFS concerning the proposed logging.

175.    Unless enjoined, Defendant will carry out the proposed logging, including the logging of mature redwoods, log-hauling, and implementing road improvements along sensitive alluvial floodplain habitat. This is reasonably certain to result in the unlawful take of CCC coho salmon in violation of 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) & (G).

176.    Thus, the proposed logging violates 16 U.S.C. §§ 1533(d), 1538(a)(1)(B) & (G).

WHEREFORE, Plaintiffs pray for relief as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and further relief as follows:

1.    This Court declare that Defendant's proposed logging is illegal under the ESA unless and until Defendant lawfully obtains Incidental Take Permits for each of the Gualala Listed Animals;

2.    This Court enjoin Defendant from carrying out the proposed logging until and unless Defendant lawfully obtains Incidental Take Permits for each of the Gualala Listed Animal;

3.    This Court award costs of suit herein, including attorney fees, including without limitation pursuant to the ESA or other authority; and

4.    This Court grant such other and further equitable or legal relief as the Court deems just and proper.

COMPLAINT

35

1

Dated:  September 15, 2020                **GROSS & KLEIN LLP**

2

3      By: _____

4              STUART G. GROSS

5            *Attorney for Plaintiffs*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

COMPLAINT